546 So.2d 678 (1989)
George WILNER
v.
MISSISSIPPI EXPORT RAILROAD COMPANY.
No. 58254.
Supreme Court of Mississippi.
June 7, 1989.
Rehearing Denied July 26, 1989.
*679 W. Joseph Kerley, Jackson, John G. Clark, Pascagoula, for appellant.
Raymond L. Brown, Brown and Associates, Pascagoula, for appellee.
En Banc.
HAWKINS, Presiding Justice, for the Court:
George Wilner appeals a jury verdict and judgment for the defendant Mississippi Export Railroad Company in the circuit court of Jackson County. The main thrust of his appeal is an egregious violation of a pre-trial discovery order of the court and ambush during presentation of the defendant's evidence. The defendant railroad cross-appeals contending the circuit judge erred in refusing its request for a directed verdict when the plaintiff rested, and also a refusal of a peremptory instruction for the defendant at the close of trial.
Fortunately for the defendant we find the issue raised on cross-appeal dispositive and do not address the issues on direct appeal.

FACTS
Highway 613 in Jackson County is a rural, hard-surfaced highway. It intersects with Mississippi Export Railroad Company's railroad track. At the crossing the railroad track runs almost due North and South, while the highway runs in a slightly northeasterly-southwesterly direction. The crossing makes a quite narrow "X" with the narrow angle measuring twelve degrees.
On Sunday, January 23, 1983, approaching the crossing from the North headed Southerly on the highway there was first a round reflectorized yellow sign, one yard in diameter, with a black "X" across it, and between the angles on each side the letter "RR." This sign was 550 feet from the crossing.
On the pavement, also 550 feet from the crossing, was a white reflectorized painted line two feet wide across the right lane, termed by the railroad a "stop bar."
Just beyond the stop bar, proceeding closer to the crossing, was a white painted cross extending across the entire right lane, called by the railroad a "crossbuck," and also the painted letters "RR." The cross was twenty feet long along the highway. Then, 500 feet from the crossing was another crossbar painted across the right lane of traffic.
One hundred thirty-five feet from the crossing was a 175-watt mercury street light. On the opposite side of the crossing, the same distance from the track, was another identical streetlight.
*680 Also, beginning 135 feet from the crossing, and extending diagonally across the right lane to a distance of 70 feet from the crossing, was another white reflectorized stop bar painted on the pavement. Finally, 135 feet from the crossing was a standard railroad crossbuck sign reading "Railroad Crossing."
Wilner on that morning was an employee of Brown & Root, a construction company which was doing work for the Chevron plant. He had only lived at the location of his home that day for approximately two weeks.
He awoke at ten minutes to four that morning, washed his face, brushed his teeth, fixed his lunch, drank a Pepsi-Cola, and left for work in his 1978 Ford pickup. He said that he left early because it was a foggy morning.
According to Wilner, "I was going slow  I had to get up early and go slow because the fog was so bad I couldn't see." He also testified the fog was "very dense."
The crossing was approximately three miles from Wilner's home on the route he traveled to and from work, and prior to that morning he had crossed it approximately 18 times. Wilner had his lights on low beam because of the fog. He said that he was alert.
Also according to Wilner, approximately three-tenths of a mile from the crossing he saw a boy at a mailbox who he swerved to miss, which frightened him. He glanced in his rear-view mirror and kept driving. The speed limit was 55 miles per hour; he was driving 40 miles per hour. He testified he did not see any of the warning signs as he approached the crossing. He said that he was trying to look into the darkness to see if anything was ahead of him, or on the side of the road.
When he was approximately 50 feet from the track, he saw coal cars of the train crossing the highway. He did not have time to hit his brakes, only time to swerve slightly to the left, before the pickup struck the train.
The train was headed North and the pickup struck the 83rd, 84th and 85th cars of 101 cars. The pickup was totally demolished. Except for the loss of two front teeth, Wilner sustained moderate injuries, no fractures.
Two witnesses qualifying as experts testified for Wilner.
William W. Adams was a consulting engineer, who in 1952 received a bachelor's degree in engineering from Mississippi State University. He made extensive measurements of the lighting from the street lights. (They are called "streetlights" although out in the country.) He concluded that there was no significant amount of light from the light at the crossing itself. He also stated that on a foggy night a light of this type tended to "illuminate the fog particles themselves" creating a "curtain" more or less so that it would be more difficult to see beyond the light than if the light were not there at all. In his opinion the brighter the light, the worse it would have been, insofar as a driver's ability to see a train at the crossing on a foggy night. According to him, the same principle would apply to a heavy rain. He also testified that in the absence of fog, it would make no difference whether the streetlight was there or not.
He had no opinion as to whether the streetlight obstructed the view of the warning signs.
Hibbett Neal, a consulting engineer from Jackson, received a bachelor of engineering degree from Vanderbilt and a masters from Georgia Tech.
He testified that warning devices were either passive or active. The lowest level of a passive warning was a standard crossbuck sign. The next level would be flashing lights, activated by a train crossing the highway. The final level of active warning would be flashing lights and gates at the crossing, or flashing lights and also a flagman at the crossing with flashing lights. He testified this crossing was "extra hazardous." He said the passive warnings given were "definitely inadequate." In his opinion the crossing was made hazardous because of the fog. Without the fog he was of the opinion the warning may have been adequate. The geometry of the crossing *681 did not affect his opinion as to whether there should have been an additional warning.
There was no testimony offered that flashing signals would have, or probably would have been seen.
In the ten years previous to the date of this accident, there had been one other accident at this crossing, July 17, 1979, during daylight hours when it had been raining.
On July 18, 1985, the defendant installed flashing lights and bells at this crossing as part of its overall program of crossings.
The above summarizes the evidence offered on behalf of Wilner. When he rested the railroad put on testimony of the absence of fog that morning, and a highway patrolman testified that Wilner had told him shortly after the accident that prior to reaching the crossing he had passed a man on the side of the road, had looked through his rearview mirror at him and when he turned and saw the train, it was too late to avoid the accident. In sum, there was no evidence offered by the defense which aided Wilner in making a jury issue on liability.
This case went to trial in May, 1986. When the plaintiff rested, the defendant moved for a directed verdict which the court overruled. After the defendant had put on its evidence and both sides had closed, a requested peremptory instruction to find for the defendant was refused. The circuit judge in refusing the requested peremptory instruction observed that the defendant was probably correct, but he was going to submit the issue of liability to the jury.
The jury returned a verdict for the defendant. The plaintiff has appealed, and the defendant has cross-appealed.

LAW
Of necessity we address first the issue raised by the defendant railroad on cross-appeal, was a jury issue made on liability?
The criteria for a directed verdict is a familiar one. When the defendant moves for a directed verdict at the close of the plaintiff's case, the trial court must consider the evidence in the light most favorable to the plaintiff, giving the plaintiff the benefit of all reasonable inferences that may be drawn therefrom; unless the plaintiff's evidence is so lacking that reasonable jurors could not reach a verdict for the plaintiff, the motion must be denied. McGaugh v. Gray, 495 So.2d 1024 (Miss. 1986); White v. Hancock Bank, 477 So.2d 265 (Miss. 1985). Effective January 1, 1982, Rule 50(b) Mississippi Rules of Civil Procedure removed a request "peremptory instruction" from our civil procedure nomenclature. Such a request is now made in the form of a motion for a directed verdict at the close of the evidence. We have held, however, that a request for a peremptory instruction is the functional equivalent of a motion for a directed verdict under Rule 50(a). Maxwell v. Illinois Central Gulf R.R., 513 So.2d 901 (Miss. 1987); White v. Miller, 513 So.2d 600, 602, n. 2 (Miss. 1987); Upton v. Magnolia Elec. Power Ass'n, 511 So.2d 939, 943 (Miss. 1987).
The same standard applies to a request for a peremptory instruction. Farm Bureau Mutual Ins. Co. v. Todd, 492 So.2d 919 (Miss. 1986).
From Wilner's own testimony, he was traveling forty miles per hour in the dark and in a dense fog when he first saw the train. This is just about sixty feet per second. If he was only about fifty feet from the train when he first saw it, as he testified, he obviously had no time to avoid striking the train.
The opinion of the expert that the crossing was extra hazardous does not end the inquiry. Every railroad crossing can be extra hazardous, and is potentially dangerous. Motorists tend to forget it, but driving an automobile is potentially dangerous. Some would state that living is dangerous.
The question is whether the defendant railroad, considering the danger of the crossing, should have in the exercise of reasonable care placed more or different warnings than it did? By clear, unmistakable signs and language there was a warning of a crossing. The railroad was entitled *682 to assume that approaching motor vehicle drivers would upon seeing the signs slow sufficiently to see whether or not a train was on or near the crossing.
Our statute on railroad crossings reads:
§ 77-9-247. Railroads shall erect "railroad crossbuck."
Every railroad corporation ... operating or controlling any railroad track intersecting a public road or street at grade crossings shall erect and maintain at each such crossing the standard sign known as "railroad crossbuck", the design of which has been standardized by the Association of American Railroads and which appears in the "Manual on Uniform Traffic Control Devices" for the State of Mississippi as adopted by the commissioner of public safety, the Mississippi State Highway Commission and the United States Department of Transportation.
There is no contention but that the warning signs in this case more than complied with the statute. Slay v. Illinois Central Gulf R. Co., 511 So.2d 875 (Miss. 1987).
It may very well be that the streetlights at the crossing in the foggy darkness played tricks upon Wilner's vision, and contributed to his failure to see the train. But, surely the railroad is not to be blamed for placing lights at the crossing. Indeed, according to Adams, Wilner's expert witness, the brighter the lights on that morning the more Wilner's vision would have been obscured.
Other than the claim as to the streetlights on this foggy pre-dawn morning, there is nothing about this crossing which made it deceptively dangerous, or any more dangerous than the hundreds of others in this state.
Had there been additional warnings, such as flashing lights, or a living flagman with a flashlight, Wilner may or may not have seen them. We cannot know. Suffice it to say, in the exercise of reasonable care, the defendant railroad gave all the warning of the crossing required by law.
REVERSED AND RENDERED ON CROSS-APPEAL. AFFIRMED ON DIRECT APPEAL. JUDGMENT OF THE CIRCUIT COURT AFFIRMED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
DAN M. LEE, P.J., concurs in result only.